Michael R. Mushkin, Esq.
Nevada Bar No. 2421
L. Joe Coppedge, Esq.
Nevada Bar No. 4954
**MUSHKIN & COPPEDGE**
6070 S. Eastern Avenue, Suite 270
Las Vegas, Nevada 89119
Telephone: 702-454-3333
Facsimile: 702-386-4979
michael@mccnvlaw.com
jcoppedge@mccnvlaw.com

*Attorneys for Plaintiffs*
*The Wave Group*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| LAS VEGAS WAVE GROUP, LLC, a Nevada limited-liability company, and THE WAVE GROUP GLOBAL, INC., a Delaware Corporation;<br><br>Plaintiffs,<br><br>vs.<br><br>FOSTER GILLETT, an individual;<br><br>Defendant. | Case No.:<br><br>**COMPLAINT**<br><br>**JURY DEMAND REQUESTED** |

Plaintiffs, Las Vegas Wave Group, LLC and The Wave Group Global, Inc. (collectively, "Wave Group" or "Plaintiffs"), by and through their attorneys, the law firm Mushkin & Coppedge, allege against Defendant, Foster Gillett ("Gillett" or "Defendant") as follows:

## NATURE OF THE ACTION

1. This action involves claims for fraud, negligent misrepresentation, breach of fiduciary duty, breach of contract, and breach of the covenant of good faith and fair dealing. Because Defendant's conduct was intentionally done to injure Plaintiffs with a willful and conscious disregard for Plaintiffs' rights, in addition to compensatory damages, Plaintiffs are entitled to recover punitive damages for the sake of example and by way of punishing Defendant.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the claims under 28 U.S.C. § 1332(a) as the amount in controversy exceeds $75,000.00 and the parties are citizens of different states.

3. Venue is proper pursuant to 28 USC §1391(b) as the claims arose in this district and involve real property located within this district.

## THE PARTIES

4. Plaintiff, Las Vegas Wave Group, LLC is and at all relevant times was a Nevada Limited-Liability Company doing business in Clark County, Nevada.

5. Plaintiff, The Wave Group Global, Inc. is and at all relevant times was a Delaware corporation doing business in Clark County, Nevada.

6. Defendant, Foster Gillett ("Gillett") is and at all relevant times was a Colorado resident who performed acts in Clark County, Nevada which form the basis of this Complaint.

## FACTUAL ALLEGATIONS RELATED TO ALL CLAIMS

7. In or about mid-March 2024, Plaintiffs entered into a joint venture with Defendant to purchase two parcels of land in Las Vegas, Nevada, one a 96-acre parcel of land (the "96-Acre Site") and a second parcel consisting of 38 acres (the "38-Acre Site", and collectively with the 96-Acre Site, the "Land") for the purpose of developing a resort hotel-casino and sports entertainment project (the "Project").

8. The Wave Group presented the Land deal to Gillett pursuant to Letters of Intent obtained by Plaintiffs, which required a lead financial partner to provide proof of funds to purchase the Land and develop the Project.

9. Gillett, often boasting about his substantial net worth, along with his legal counsel, William Monheit ("Monheit") insisted that Gillett be a part of everything related to the Project, including all transactions and communications, and that he be the Lead Financial Partner and buyer of the Land.

10. At that time and several times thereafter, Gillett represented to Plaintiffs' principal, Torrey James Ward ("Ward") that if the Wave Group got the Land under contract and into escrow, and if the due diligence was completed, all of which was accomplished, Gillett would reimburse

1 the Wave Group for all of its due diligence expenses, purchase the Land and develop the Project.

2  11. Gillett then authorized Ward to commence negotiations with the publicly traded and large casino Red Rock/Stations Casino Group ("RR Stations Group") to purchase the 96-Acre Site for $500,000,000.00 and the 38-Acre Site from the Tharaldson Group for $154,000,000.00.

 12. During the negotiations with the RR Stations Group, Gillett personally participated in video and conference calls between the RR Stations Group's Executive and Legal Team and the Wave Group's Executive and Legal Teams whereby he confirmed his involvement in the joint venture as the Lead Financial Partner, as the buyer of the Land and ultimately, after purchase, his plans to develop the Land.

 13. On March 17, 2024, Monheit wrote to Ward, "I just told Foster you will be calling him with what the seller is requiring to be shown by him."

 14. On March 18, 2024, Gillett provided the Wave Group with a Bank Comfort Letter and a Bank Statement from Xirik Commercial & Private Bank ("XCP") dated March 18, 2024, evidencing that Gillett had funds in his account valued at $532,764,877.00.

 15. Thereafter, Gillett and his attorney, Monheit, directed all activities related to the joint venture, including the fact that all due diligence had to go through them first for approval, and that the due diligence had to go through a company of their choosing.

 16. Plaintiffs agreed with Gillett's requirements and that was the order of operations.

 17. On April 3, 2024, when Plaintiff Ward confirmed his booked ticket to fly out to have meeting with Gillett at his Aspen, Colorado compound, Gillett reaffirmed his involvement in the joint venture via text message to Ward stating, "[I]t accomplishes much more me coming to Vegas than you coming here."

 18. Shortly thereafter, in order to comply with the Letters of Intent and Escrow deadlines, the Wave Group required a payment of approximately $1,400,000.00 to raise the $20,000,000.00 deposit on the Land from another group to cover their fees and costs, of which Gillett was fully informed and agreed he would work on.

 19. Unfortunately, despite his substantial net worth, Gillett stated he was not able to

1  come up with the $20,000,000.00 or make an immediate payment of $1,400,000.00 due to him
2  having to move monies around which he claimed took too much time and thus he couldn't do
3  right then.

4      20.    Instead, Gillett instructed the Wave Group to find someone to temporarily come
5  up with this amount.

6      21.    Gillett and Monheit agreed that Gillett would guarantee the payment if the Wave
7  Group could have someone else to advance the payment of the $1,400,000.00 payment to cover
8  the interest for the 90-day escrow period.

9      22.    Plaintiffs, the Wave Group, with Gillett's full knowledge and at his direction
10 proceeded to obtain the $20,000,000.00 down-payment deposits necessary to place the Land in
11 escrow following the Letters of Intent at a cost to the Wave Group of over $1,400,000.00 to cover
12 the interest for the 90-day escrow period

13     23.    The Wave Group presented multiple parties to Gillett for the immediate payment
14 of the $1,400,000.00, provided that Gillett would guarantee repayment.

15     24.    On April 19, 2024, after Gillett confirmed in a telephone call to Ward and the
16 Wave Group's attorneys that the Wave Group could use Gillett's J.P. Morgan account as
17 guarantee collateral, Ward wrote, "Good Monday Morning brother FG!! Sorry to ask again. I'm
18 trying to get this over the line. What are the assets in the (your) $1.5m JP account? Is it cash-
19 equivalents? Or stock?"

20     25.    Later that day, Gillett and Monheit called and personally spoke with a Wave Group
21 partner named Vatche Sarkoyan ("Sarkoyan") and his family in the presence of Ward and
22 partners, and in which Gillett represented he would serve as a guarantor of the $1,400,000.00 if
23 Sarkoyan could quickly execute a deposit fee wire within the next day or two, as Gillett further
24 stated it would take him 3-5 days to liquidate his stocks and sell them.

25     26.    During the course of the conversation with Sarkoyan and Ward, Gillett provided a
26 screenshot of his funds via text message to Ward as proof that Gillet had investment assets of
27 $1,510,285.99 in a J.P. Morgan account.

28     27.    In furtherance of Gillett's representation, Monheit sent an email to Sarkoyan on

1  April 19, 2024 confirming the discussion.

2  28. The April 19, 2024 email from Monheit also attached a draft promissory note in
3  the sum of $1,500,000.00.

4  29. The draft promissory note included a Guarantee provision that "[t]his Note will be
5  guaranteed by that certain "Unconditional and Continuing Guarantee" dated of even date herewith
6  (the "Guarantee") with Foster Gillett as "Guarantor."

7  30. In reliance upon Gillett's representations to guarantee the payment, Sarkoyan
8  wired $1,406,797.50 on April 23, 2024, to allow Gillett and the Wave Group to meet the deadline
9  to maintain control of the Land deals and deposits and have them go into escrows.

10  31. In further reliance on Gillett's representations, the Wave Group executed a
11  Collateralized Promissory Note in the Principal Sum of $1,410,000.00 in favor of Vatche
12  Sarkoyan, Arlene Sarkoyan and S3H, Inc. (collectively, the "Lender" or "Holder").

13  32. As a possible sign of things to come, Gillett went silent for a few days. As a result,
14  the Collateralized Promissory Note had to be guaranteed by fellow Wave Group partner Dr.
15  Benjamin Rudnitsky, who executed a "Collateral Pledge Agreement".

16  33. Notwithstanding Gillett's failure to officially execute an Unconditional and
17  Continuing Guarantee, the Joint Venture continued as directed and led by Gillett and Monheit.

18  34. The Wave Group's attorneys and team, acting at all times under the direction of
19  Gillett and Monheit, negotiated the purchase and sale agreements for both the 96-Acre Site and
20  the 38-Acre Site.

21  35. On April 25, 2024, the Wave Group's counsel provided a draft Purchase and Sale
22  Agreement and Joint Escrow Instructions to Gillett and Monheit whereby The Wave Group
23  Global, Inc. was the Purchaser, and CV Propco, LLC and NP Tropicana LLC were the Sellers
24  (RR Stations Group) for approximately 95.93 acres of real property located in Clark County,
25  Nevada for a purchase price of $500 Million Dollars.

26  36. Monheit responded later that evening with a markup and edit of the Purchase and
27  Sale Agreement.

28  37. At the insistence of Gillett and Monheit, the Purchase and Sale Agreement had to

include, among other provisions, an assignment provision that provided Gillett with the exclusive right to purchase the Land for himself. The Purchase and Sale Agreement stated:

> Purchaser may, without Seller's consent, assign this Agreement and its rights hereunder in their entirety to any Affiliate of Purchase, (specifically) Foster Gillett, or any Affiliate of Foster Gillett, provided that: (i) any such assignment shall not delay the Closing Date; and (ii) Seller receivers a fully executed copy of such assignment (each, a **Permitted Assignment**").

38. After the exchange of multiple drafts over several weeks with five legal teams all reviewing and negotiating, The Wave Group along with Gillett entered into the Purchase and Sale Agreement ("PSA") as of May 8, 2024.

39. Among other things, the Purchase and Sale Agreement provided for a Due Diligence Period expiring on August 6, 2024.

40. Thereafter, Plaintiffs, worked directly with Gillett and Monheit, who provided specific and detailed instructions as to exactly how the due diligence was to be done, and made it clear the due diligence would not be considered complete until Monheit's and Gillett's directions had been followed.

41. On May 14, 2024, The Wave Group's counsel, J. Douglas Driggs, Jr. wrote, "As a follow up to the environmental due diligence call, we should have a legal due diligence call to discuss the process. We have formulated a plan, but did not want to charge ahead without coordinating."

42. Mr. Monheit responded shortly thereafter, stating that he "Agreed."

43. Although Plaintiffs proposed local consulting firms to use for the due diligence, Monheit insisted that Plaintiffs retain and use AEI, an environmental consulting firm in which Monheit's daughter, Courtney Monheit, was a Senior Vice President and the "Main Contact" for the 96-Acre Site at a substantially increased cost to Plaintiffs.

44. As with all directions insisted upon by Gillett and Monheit, Plaintiffs acquiesced and engaged AEI.

45. On May 20, 2024, AEI sent Phase I & II Proposals to multiple parties connected to the PSA & Wave Group associates, always including Monheit on all communications. Then

most notably, per Gillett and Monheit, before being signed the revised proposals had to include "reliance language to Foster Gillett, and any entity controlled by Foster Gillett" that he would own the reports and have access to them after they were completed, along with the Wave Group.

46. On May 22, 2024, Courtney Monheit wrote an email addressed to "Bill (Monheit) and Torrey (Ward)" stating, "Please find the 50% Prepay Invoice attached for the 96AC Site."

47. In response to his daughter's email, Monheit emailed Gillett, "Hi Foster, I am resending you the attached AEI Consultants invoices for 50% of the contracted due diligence costs on the 96 acres in Las Vegas by The Wave Group Global, Inc, along with the wiring instructions. Please do not hesitate to contact me with any questions and let me know if the wire has been ordered for today."

48. The attached AEI Invoice that Monheit provided to Gillett for payment was in the amount of $364,650.00, and was addressed to "Forrest (sic) Gillett c/o The Wave Group Global, Inc."

49. Also, on or about May 22, 2024, AEI provided a Revised Proposal for Phase II Investigative Services for the 96-Acre Site and proposals for the 38-Acre site.

50. The Purchase and Sale Agreement also provided:

> As of the Effective Date, Purchaser shall procure and shall keep in full force and effect (or shall ensure that any Purchaser Parties entering the Property procure and keep in full force and effect) during the term of this Agreement one or more commercial general liability policies, evidencing that Purchaser and the applicable Purchaser Parties, if any, are carrying a commercial general liability insurance policy with minimum combined single limits of Two Million Dollars ($2,000,000.00) for each occurrence and Five Million Dollars ($5,000,000.00) in the aggregate with respect to the Property. Prior to entry on the Property by Purchaser or any Purchase Properties, Purchaser shall deliver or cause such Purchase Parties to deliver a certificate of insurance which names Seller as additional insured thereunder verifying such coverage to Seller.

51. Gillett, as required by the Sellers (RR Stations Group) and pursuant to his and his own counsel Monheit's demand, was named as an additional insured under the policies.

52. In fact, it was Monheit who worked with his daughter Courtney to obtain the AEI

Certificate of Liability Insurance. On May 30, 2024, Monheit wrote to Ward and the Wave Group head of development, Joe Faust:

> I believe the attached is the copy of the insurance certificate from AEI that you were looking for that Torrey sent me on May 22, 2024. Please see the additional insured provision which I believe covers the seller.

53. Again, Foster Gillett was included as an additional insured under the AEI Certificate of Liability Insurance.

54. It is clear from the email correspondence that everyone, including his own counsel, expected Gillett to pay for the due diligence as he agreed and stated for months, both in-person and on calls.

55. The parties continued to work together in cooperation of and in furtherance of the joint venture as Gillett arrived in Las Vegas to inspect the properties, the Project and the Wave Group office on or about May 22, 2024.

56. Gillett arrived at the Las Vegas Wave Group office on Dean Martin Dr. and conducted in-person meetings with each team and consultant members, to go over the due diligence tasks, plans, and ultimately approve the due diligence budgets in-person in front of the Wave Group team.

57. Then, while presenting Gillett's plans for the development of the Land, Gillett reaffirmed multiple times, in the presence of Wave Group consultants and team members Ward, Todd Yarbrough ("Yarbrough"), attorney Mark James, head of finance Debbie Hawkins ("Hawkins"), office manager Adam Levenberg ("Levenberg"), his own legal team and others, that he was going to buy the Land and pay for the due diligence which he and Monheit required.

58. Gillett specifically stated to Ward and the Wave Group team that "Gillett knew the Wave Group team and consultants had not been paid in a long time as they performed the due diligence that Gillett and Monheit required, and that he would take care of them and all the due diligence bills so not to worry and keep going.

59. Gillett also reviewed the Wave Group accounts payable incurred to date and agreed to pay the outstanding accounts payable balance and buy out the shareholders of the Wave

1 Group.

60. Gillett then had Ward prepare a formal joint venture structure entitled FG Nevada Holding Companies to buy and acquire all Wave Group companies and associated projects in Las Vegas.

61. Ward, along with head of finance Hawkins, Mark James, Joe Faust, and Yarbrough, then confirmed the amounts discussed and agreed to by Gillett during the Las Vegas office meetings.

62. On May 30, 2024, Mr. Ward forwarded an email chain to Gillett providing a description of some of the things Plaintiffs would have to deal with daily over the next 60-plus days and in the office.

63. The list included, among other things, the "proposed schedule with our requested dates for the Phase I ESA, ALTA Survey, Asbestos Survey and Phase II work." Also included were the attached calendar and associated site maps for the planned Phase II work.

64. Gillett did not respond to Ward's email, failed to promptly pay for the due diligence that he and Monheit required, thus forcing the Wave Group to suspend the due diligence work until it was at least paid up to date for its work.

65. On June 2, 2024, Gillett and his counsel Monheit had several telephone calls with Ward and Mark James in response to the Wave Group suspending due diligence until payment arrangements were made toward the outstanding balance of due diligence done at the request and instruction of Gillett and Monheit.

66. Ward wrote to Gillett and provided a revised June budget that was reduced from almost $14,000,000.00 (that included the Wave Group's accounts payable and the shareholder buyout that Gillett requested) to $1,700,000.00 to cover costs of the due diligence and Land work.

67. The email described the key essential team and lowest budget needed to accomplish the due diligence through at least through the month of June.

68. On June 3, 2024, Ward wrote to Monheit and Gillett regarding the 38-Acre Site. Neither Monheit nor Gillett replied or indicated that Gillett was not proceeding with the joint venture.

69. In fact, Gillett has never advised Plaintiffs that he is not proceeding with the joint venture.

70. On June 6, 2024, after several days of threats and promises by Gillett via phone calls to most Wave Group members, specifically including Mark James, Ward, Joe Faust, and legal, Gillett sent a 50% deposit of $265,000 to AEI, Monheit's daughter's company for their 96-Acre studies but only a partial payment in the amount of $110,000 to the Wave Group for the due diligence previously invoiced, confirmed that wire transfer via text and asked the Wave Group to get restarted.

71. In response to the partial payment, Ward again reiterated via email and telephone calls that the Wave Group really needed the $1.6M within a week or the week after.

72. Gillett once again confirmed his intent to pay for the Due Diligence as he wrote via text on June 6, 2024:

> Torrey when someone sends you money that makes them uncomfortable don't then apply pressure. I have asked for the money to be released to me. At this point I have a wonderful staff working on it. It literally has nothing to do with your needs or any ramifications. This process is time consuming, expensive and intense.

Gillett continued,

> "Anyways you have 110,000 sent to you I completed a wire."

73. Gillett then told Ward "we must not lose or not complete the due diligence or fall out of escrow, or I (Gillett) won't be able to close on and buy the Land in time, so please keep going and restart the team and listen to me.

74. In reliance upon Gillett's and Monheit's promise of more payment coming and Gillett closing on the Land once the Wave Group completes the due diligence, the Wave Group team restarted the due diligence in reliance upon Gillett's promise to pay Plaintiffs the $1.7 million.

75. On or about June 10, 2024, Monheit's daughter's company, AEI provided an invoice number 96020 billed to Forrest Gillett (sic) c/o The Wave Group Global, Inc for the 38-

Acre Site, further evidencing the parties' understanding and Gillett's agreement to pay for the due diligence.

76. Notwithstanding the clear and unrefuted evidence demonstrating Gillett's numerous representations that he would pay for due diligence required by him and Monheit, Gillett ultimately failed to pay the Wave Group for all of the due diligence work Plaintiffs performed.

77. In a subsequent conversation with Mark James in early 2025, Monheit admitted that after the Wave Group delayed the start of the on-property due diligence by one-week due to Gillett's failure to pay for the existing accounts payable, Gillett told Monheit that Gillett had no intention of going forward to purchase the Land for the joint venture, and had no intention of doing business with the Wave Group or its principals whatsoever.

## FIRST CLAIM FOR RELIEF

### ("Fraud")

78. Plaintiffs hereby repeat and reallege each allegation contained in paragraphs 1 through 77 of this Complaint and incorporate the same herein by reference as though fully set forth.

79. As set forth above, beginning in mid-March 2024 and continuing through the June 2024, Gillett, represented multiple times to Plaintiffs' principal, Ward and others, that if the Wave Group got the Land under contract and into escrow, and if the due diligence was completed, all of which was accomplished, Gillett would pay the Wave Group's existing accounts payable, pay the Wave Group for all of its due diligence expenses, purchase the Land and develop the Project.

80. Gillett's numerous representations were false in that despite demand; Gillett has failed and refused to pay the Wave Group's existing accounts payable, pay the Wave Group for all of its due diligence expenses, purchase the Land and develop the Project.

81. In reliance upon Gillett's representations and at his direction, Plaintiff incurred due diligence expenses for the Project in an amount in excess of several million dollars.

82. Gillett knew the representations he made that if the Wave Group got the Land under contract and into escrow, and if the due diligence was completed, all of which was

accomplished, that Gillett would pay the Wave Group's existing accounts payable, pay the Wave Group for all of its due diligence expenses, purchase the Land and develop the Project were false, or that such representations were made with insufficient basis for making them.

83. Gillett's representations were intentionally made to induce Plaintiff to incur substantial expenses related to the Project at a time when Gillett did not intend to pay the Wave Group for its existing accounts payable, pay the Wave Group for all of its due diligence expenses, purchase the Land and develop the Project.

84. Plaintiff justifiably relied upon the false representations made by Gillett by incurring due diligence expenses related to the Project in an amount in excess of several million dollars.

85. In reliance upon Gillett's false representations and as a direct and proximate result of Gillett's wrongful conduct, Plaintiffs have suffered damages in the form of lost business opportunity, damage to business reputation and due diligence expenditures all in excess of $75,000.00.

86. Gillett's conduct was intentionally done to injure Plaintiffs with a willful and conscious disregard for Plaintiffs' rights, constituting oppression, fraud and/or malice.

87. Plaintiffs in addition to compensatory damages, is entitled to recover all attorney's fees it has reasonably incurred and to recover punitive damages for the sake of example and by way of punishing Defendant Gillett to deter similar conduct in the future.

**SECOND CLAIM FOR RELIEF**

**("Negligent Misrepresentation")**

88. Plaintiffs hereby repeat and reallege each allegation contained in paragraphs 1 through 87 of this Complaint and incorporate the same herein by reference as though fully set forth.

89. As set forth above, beginning in mid-March 2024 and continuing through the June 2024, Gillett, represented multiple times to Plaintiffs' principal, Ward and others, that if the Wave Group got the Land under contract and into escrow, and if the due diligence was completed, all of which was accomplished, Gillett would pay the Wave Group's existing accounts payable, pay

the Wave Group for all of its due diligence expenses, purchase the Land and develop the Project.

90. The information supplied by Gillett that if the Wave Group got the Land deal under contract and into escrow, and if the due diligence was completed, all of which was accomplished, Gillett would pay the Wave Group's existing accounts payable, pay the Wave Group for all of its due diligence expenses, purchase the Land and develop the Project was false.

91. Gillett knew or should have known that the representations that if the Wave Group got the Land under contract and into escrow, and if the due diligence was completed, all of which was accomplished, Gillett would pay the Wave Group's existing accounts payable, pay the Wave Group for all of its due diligence expenses, purchase the Land and develop the Project were false.

92. Gillett failed to exercise reasonable care or competence in communicating the information to Plaintiffs that he would pay the Wave Group's existing accounts payable, pay the Wave Group for all of its due diligence expenses, purchase the Land and develop the Project.

93. Plaintiffs justifiably relied upon the false representations made by Gillett by that if the Wave Group got the Land under contract and into escrow, and if the due diligence was completed, all of which was accomplished, Gillett would pay the Wave Group's existing accounts payable, pay the Wave Group for all of its due diligence expenses, purchase the Land and develop the Project.

94. In reliance upon Gillett's false representations and as a direct and proximate result of Gillett's conduct, Plaintiffs have suffered damages in the form of lost business opportunity, damage to business reputation and due diligence expenditures, all in excess of $75,000.00.

95. Plaintiffs have been required to retain counsel to prosecute this action and are entitled to recover its reasonable attorney's fees and costs of this action.

### THIRD CLAIM FOR RELIEF

### ("Breach of Contract")

96. Plaintiffs hereby repeat and reallege each allegation contained in paragraphs 1 through 95 of this Complaint and incorporate the same herein by reference as though fully set forth.

97. Plaintiffs and Gillett entered into an agreement wherein Gillett agreed, among

other things, that if the Wave Group got the Land under contract and into escrow, and if the due diligence was completed, all of which was accomplished, Gillett would pay the Wave Group's existing accounts payable, pay the Wave Group for all of its due diligence expenses, purchase the Land and develop the Project.

98. Plaintiffs fully performed all obligations under the agreement, including but not limited to getting the Land under contract and into escrow, and completing the due diligence, all as directed by Gillett and his attorney, Monheit.

99. Gillett breached his obligations under the agreement, by failing, among other things, to pay the Wave Group's existing accounts payable, pay the Wave Group for all of its due diligence expenses in incurred at the direction of Gillett and his attorney, Monheit, purchase the Land and develop the Project.

100. Defendant's breach of the agreement was not waived, suspended or otherwise excused.

101. As a direct and proximate result of Gillett's wrongful conduct, Plaintiffs have suffered damages in the form of lost business opportunity, damage to business reputation and due diligence expenditures, all in an amount in excess of $75,000.00.

102. Plaintiffs have been required to retain counsel to prosecute this action and are entitled to recover its reasonable attorney's fees and costs of this action.

## FOURTH CLAIM FOR RELIEF

### ("Breach of the Covenant of Good Faith and Fair Dealing")

103. Plaintiffs hereby repeat and reallege each allegation contained in paragraphs 1 through 1022 of this Complaint and incorporate the same herein by reference as though fully set forth.

104. It is well settled in Nevada that every contract imposes upon the contracting parties the duty of good faith and fair dealing.

105. Gillett owed Plaintiffs a duty of good faith and fair dealing.

106. Implied in the agreement is a covenant that if the Wave Group got the Land under contract and into escrow, and if the due diligence was completed, all of which was accomplished,

Gillett would pay the Wave Group's existing accounts payable, pay the Wave Group for all of its due diligence expenses, purchase the Land and develop the Project.

107. Defendant's breached the duty of good faith and fair dealing when it was performed in a manner that was unfaithful to the purpose of the agreement and to the justified expectations of Plaintiffs.

108. Defendant's breached the duty of good faith and fair dealing by failing, among other things, to pay the Wave Group's existing accounts payable, pay the Wave Group for all of its due diligence expenses, purchase the Land and develop the Project.

109. As a direct and proximate result of Gillett's wrongful conduct, Plaintiffs have suffered damages in the form of lost business opportunity, damage to business reputation and due diligence expenditures, all in an amount in excess of $75,000.00.

110. Plaintiffs have been required to retain counsel to prosecute this action and are entitled to recover its reasonable attorney's fees and costs of this action.

**FIFTH CLAIM FOR RELIEF**

**("Breach of Fiduciary Duty")**

111. Plaintiffs hereby repeat and reallege each allegation contained in paragraphs 1 through 110 of this Complaint and incorporate the same herein by reference as though fully set forth.

112. By virtue of the agreement between the parties, the parties formed a joint venture whereby the parties worked cooperatively to complete the due diligence, and upon completion, Gillett agree he would purchase the Land and develop the Project.

113. As a result, Gillett entered a special relationship with Plaintiffs, whereby, among other things, Gillett was bound to act for the benefit of Plaintiffs.

114. Such relationship imposed a fiduciary duty upon Gillett of loyalty and the utmost good faith.

115. By virtue of Gillett's conduct with respect to the Plaintiffs, including but not limited to falsely representing that if the Wave Group got the Land under contract and into escrow, and if the due diligence was completed, all of which was accomplished, that Gillett would pay

the Wave Group's existing accounts payable, pay the Wave Group for all of its due diligence expenses, purchase the Land and develop the Project, Gillett breached and/or conspired to breach the fiduciary duties he owed to Plaintiffs.

116. As a direct and proximate result of Gillett's breach of the fiduciary duties owed to the Wave Group, Plaintiffs have suffered damages in an amount in excess of $75,000.00.

117. Gillett's breaches of his fiduciary duties owed to the Wave Group were intentionally done to injure Plaintiffs with a willful and conscious disregard for Plaintiffs' rights, constituting oppression, fraud and/or malice.

118. Plaintiffs, in addition to compensatory damages, are entitled to recover all attorney's fees it has reasonably incurred and to recover punitive damages for the sake of example and by way of punishing Defendant Gillett to deter similar conduct in the future.

**PRAYER**

WHEREFORE, Plaintiffs requests that this Court enter judgment against Defendant Gillett as follows:

1. That this Court award Plaintiffs damages against Defendant Gillett in an amount in excess of $75,000.00;

2. That this Court award Plaintiffs its reasonable attorney's fees and costs;

3. That this Court award Plaintiffs punitive damages from Defendant in an amount sufficient to punish Defendant and to make an example of Defendant to deter similar conduct in the future; and

4. That Plaintiffs be awarded such other and further relief as the Court may deem just and proper.

DATED this 22nd day of October 2025

**MUSHKIN & COPPEDGE**

/s/Michael R. Mushkin
MICHAEL R. MUSHKIN, ESQ.
Nevada State Bar No. 2421
L. JOE COPPEDGE, ESQ.
Nevada State Bar No. 4954
6070 South Eastern Ave Ste 270
Las Vegas, NV 89119